(Nos. 63204, 63240 cons.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROBERT McDONALD et al., Appellants.— THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. MARK HICKS, Appellant.

*Opinion filed September 22, 1988.—Rehearing denied December 5, 1988.*

186

CUNNINGHAM and STAMOS, JJ., took no part.

Daniel M. Kirwan, Deputy Defender, and Rita K. Peterson, Assistant Defender, of the Office of the State Appellate Defender, of Mount Vernon, for appellants Robert McDonald *et al.*

Howard B. Eisenberg, of Carbondale, for appellant Mark Hicks.

Neil F. Hartigan, Attorney General, of Springfield (Shawn W. Denny, Solicitor General, and Terence M. Madsen and David E. Bindi, Assistant Attorneys General, all of Chicago, of counsel), for the People.

CHIEF JUSTICE MORAN delivered the opinion of the court:

Defendants, Robert McDonald, Rodney Burts and Mark Hicks, were indicted in St. Clair County for the rape and aggravated kidnapping of a Collinsville woman. By separate indictment, Burts was charged with an additional count of rape. (See Ill. Rev. Stat. 1983, ch. 38, pars. 10—2(a)(5), 11—(1)(a).) All of the defendants were tried before the same jury and were found guilty on all charges. Defendants McDonald and Hicks were each sentenced to terms of 25 years for rape and 15 years for aggravated kidnapping, to run concurrently. Defendant Burts was sentenced to terms of 35 years and 20 years, respectively, on the two rape counts, and a term of 15 years for aggravated kidnapping, all to run concurrently.

Defendants appealed their convictions, alleging, among other things, that the State unconstitutionally exercised its peremptory challenges to exclude blacks from the jury. The appellate court affirmed the convictions. 139 Ill. App. 3d 1167 (unpublished order under Supreme Court Rule 23).

In cause No. 63204, defendants McDonald and Burts filed a petition for leave to appeal in this court. In cause No. 63240, defendant Hicks separately filed a petition for leave to appeal in this court. The court allowed both petitions and consolidated the appeals.

On April 30, 1986, while the defendants' appeals were pending in this court, the United States Supreme

Court released its opinion in *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. The Court held that a defendant may rely solely on evidence concerning the selection of the jury at his own trial to establish that a prosecutor has unconstitutionally exercised peremptory challenges against potential jurors solely on account of race. (*Batson*, 476 U.S. at 95, 90 L. Ed. 2d at 87, 106 S. Ct. at 1722.) The Court subsequently held that *Batson* was retroactively applicable to all cases pending on direct review when the decision was announced. *Griffith v. Kentucky* (1987), 479 U.S. 314, 328, 93 L. Ed. 2d 649, 661, 107 S. Ct. 708, 716.

In light of the *Batson* and *Griffith* decisions, we issued a supervisory order in this case on May 1, 1987. In that order, we retained jurisdiction of this cause and directed the trial court to conduct an expedited hearing to permit the defendants to present evidence to substantiate their claim of unconstitutional discrimination in the exercise of peremptory challenges. Our supervisory order also stated that if the trial court found that a *prima facie* showing of such discrimination had been made, it should then determine whether or not there is a neutral explanation by the State for the exercise of the questioned peremptory challenges. The court conducted the hearing on June 4, 1987, and found that the State had improperly excluded black veniremen solely on account of their race.

On return to this court, the issue presented for review as to all defendants is whether the trial court's finding that blacks were excluded from the jury in violation of *Batson* was erroneous. Defendant Hicks also raises two additional issues in his appeal: whether the seizure of physical evidence from him was valid when it was seized after he was taken into custody on a traffic arrest which was never prosecuted; and whether the evidence presented was sufficient to prove him guilty be-

yond a reasonable doubt. Defendants McDonald and Burts do not contest the sufficiency of the evidence as to their convictions.

The facts which are relevant to our resolution of the issues raised by defendant Hicks are as follows. The victim testified that on the evening of October 21, 1983, she was in her car in the parking lot of her place of employment. She stated that while in her car, three black men in a white Oldsmobile Cutlass pulled alongside her car. Thinking that they might need directions, she rolled her window down. The victim testified that one of the men approached her car carrying a gun. The victim rolled the window of her car up; however, the man, whom the victim later identified as defendant Burts, fired a shot through the window, unlocked the door to her car, and forced his way into the vehicle.

The victim testified that defendant Burts drove her car out of the parking lot and the Cutlass followed behind them. The victim stated that she was driven to a vacant lot, where defendant Burts parked the car, and the Cutlass pulled in behind them. The victim testified that defendant Burts then raped her. She further testified that while defendant Burts raped her, the other two men stood talking at the back of her car. She stated that she could not hear what they were saying but did hear one of the men call the other "Mark."

The witness stated that after defendant Burts raped her, he placed a jacket over her head, telling her not to look at the other men "because they were crazy and would kill" her. Defendant Burts exited the car, and another man entered the car and forced her to perform fellatio on him. Then the third man raped her. The victim stated that while she was being assaulted by each of the men, the other two would stand at the back of the car. She further testified that during the attack, she was

asked by the assailants how to get into the trunk and how to open the gas cap.

The victim testified that after the assaults, the two men in the Cutlass drove away; however, defendant Burts drove her to East St. Louis, and drove around a particular block three or four times, stopping in front of the same house each time. The victim stated defendant Burts eventually drove to the parking lot of a school in East St. Louis and raped her again before leaving. The victim stated that the police were waiting for her when she returned home, and she was taken to the hospital for treatment.

Michael Fitzpatrick, a forensic scientist with the Illinois Department of Criminal Investigation, testified on behalf of the State. He testified regarding the fingerprint comparisons he made between the latent prints found on the outside of the victim's car, and the fingerprints taken from defendants after their arrest. Fitzpatrick testified that seven prints from defendant Hicks' middle finger, five prints from Hicks' right ring finger and one print each from Hicks' right little and right index fingers were found on the driver's side roof of the victim's car. Fitzpatrick also stated that two prints from Hicks' right thumb and one print each from Hicks' right palm, right index and right middle fingers were found on the left rear window support of the victim's automobile. Fitzpatrick further testified that a print from defendant Hicks' left thumb was found on the center of the driver's side door below the window of the victim's automobile, and that one print each from Hicks' left little finger and left ring finger were found on the left rear fender above the gas cap. Finally, a print from defendant Hicks' right palm was found on the left side of the trunk lid. The witness stated that all but two of the latent prints found on the victim's vehicle were identified as belonging to one of the defendants. On cross-examination the witness tes-

tified that a latent fingerprint impression can last up to one week.

Michael Brown, also a forensic scientist with the Illinois Department of Criminal Investigation, testified on behalf of the State. He testified regarding the comparisons he made between the blood and saliva samples and head and pubic hair standards taken from all of the defendants, and the hair standards and blood and saliva samples taken from the victim and the crime scene. Brown testified that his analysis of the blood and saliva samples failed to exclude defendant Hicks as a possible donor. Brown further testified that his comparison of defendant Hicks' pubic hair standards established that the hairs were consistent with the combings taken from the victim.

The facts relevant to our resolution of the *Batson* issue are as follows. The trial judge who presided over the original *voir dire* and trial in this case also conducted the *Batson* hearing. At the *Batson* hearing, the trial court took judicial notice of the fact that all of the defendants are black. The trial court also took judicial notice of the original trial record. That record reveals that at the conclusion of the *voir dire*, the defendants moved for a mistrial on the grounds that the prosecutor had excluded all of the black veniremen, one for cause and the remaining 16 through peremptory challenges. The defendants sought leave of court to read into the record the racial composition of both the venire and of the proposed jury. The State objected and the trial court denied the motion for a mistrial. Defendants therefore were unable to establish the race of the veniremen on the record at the *voir dire*.

In addition to having the court take judicial notice of the original *voir dire* record, defendants called Burts' trial counsel, Paul Sturgeon, as a witness. Mr. Sturgeon testified that one-third, or 17, of the veniremen were

black. He further stated that the prosecutor excused one black woman for cause and exercised 16 of his peremptory challenges to exclude all of the remaining black veniremen. Mr. Sturgeon testified that all of the jurors ultimately selected to serve on the defendants' jury were white.

Rick Black, defendant Hicks' trial counsel, also testified on behalf of the defendants, and stated that the prosecutor exercised peremptory challenges to strike 16 black veniremen.

As their final witnesses at the *Batson* hearing, defendants called nine of the veniremen who had served on the original venire, eight of whom the State had peremptorily challenged. Their testimony reveals that they are all black and that they were called for jury service but did not serve on the jury that convicted the defendants. Their juror cards and their testimony at the original *voir dire* reveal the following additional information regarding only those black veniremen relevant to our discussion: Lonnie Busby is a 69-year-old widow; Raymond Falconer is a 63-year-old janitor and weekend musician; Louis Harden is a 47-year-old building engineer; Maryene Jones is a 39-year-old married school bus driver; Jimmie Swift is 34 years old and single; and Mary Mosley is a housewife.

The trial court found that the prosecutor "exercised 16 of his 18 peremptory challenges to [exclude] all the prospective black jurors" and that this fact established a *prima facie* case of discrimination. The prosecutor was then sworn and testified as to his reasons for exercising his peremptory challenges against black veniremen. To the extent the prosecutor's asserted reasons are relevant to a resolution of defendants' *Batson* claim, they are summarized as follows.

The prosecutor stated that a nurse would not be an acceptable juror because there was a substantial amount

of medical testimony which might invite a nurse to rely on her specialized knowledge in deciding the case. Allegedly for this reason, the prosecutor struck from the jury Ginnie Stricklin, a nurse.

The prosecutor further testified that a teacher or the spouse of a teacher would not be an acceptable juror because the case involved circumstantial evidence and such jurors tend to be too precise and are "not *** able to make the jump from circumstantial evidence to proof of a point." He claimed that teachers or people who live with teachers are "much more independent in their decision of a case [and] *** tend to use their own reasoning and not rely so much on the evidence and arguments presented by counsel." Allegedly based on this criterion, the prosecutor struck Raymond Falconer and L. C. Jones, whose spouses are teachers.

The prosecutor stated that young single males are the "worst juror" for a rape case, as they are unable to appreciate the gravity of the offense. During cross-examination, the prosecutor testified that he defined a young person as someone in their early twenties or younger. The prosecutor struck 34-year-old Jimmie Swift allegedly because he is a young single male.

The prosecutor also claimed to have challenged some of the black veniremen solely on the ground that they were mothers of large families. In his opinion, those jurors would tend to be overly sympathetic or compassionate toward defendants. The prosecutor testified on cross-examination that he considered a large family to be one consisting of five or more children. Allegedly based on this criterion, the prosecutor decided to strike from the jury: Leona Turley, the mother of six children; Louise Greenlee, the mother of six children; Harriette Riley, the mother of five children; and Christine McDaniel, the mother of five natural children and three foster children.

The prosecutor asserted he peremptorily challenged Maryene Jones based on her prior jury service. According to the prosecutor, veniremen with prior jury service can have preconceived notions regarding a case and are "time bombs in a case waiting to happen."

The prosecutor cited advanced age as a reason for excusing 63-year-old Raymond Falconer and 69-year-old Lonnie Busby. He opined that their age would make it difficult for them to understand a lengthy and complicated case involving a number of exhibits.

The original *voir dire* transcript and the juror cards reveal the following characteristics of certain white jurors who sat on the defendants' jury: David Reiff is a nurse's aide; Muriel Brink is a schoolteacher; Anthony Elrod is an 18-year-old single male; and Winifred Mueller is the mother of five children, has served on two previous juries and is 67 years old.

At the conclusion of the *Batson* hearing, the trial court found that the prosecutor had peremptorily challenged 16 black veniremen, and that his purported reasons for challenging those veniremen were insufficient to rebut defendants' *prima facie* case. The court concluded that the prosecutor had unconstitutionally exercised his peremptory challenges on the basis of race.

The State contends initially that defendants have failed to properly preserve their *Batson* claim because the original *voir dire* record does not disclose the race of the veniremen. The record in this case demonstrates that after jury selection but before the jury was sworn, defendants objected to the prosecutor's exercise of his peremptory challenges to exclude 16 black veniremen. This is a timely objection to the striking of these 16 black veniremen from the jury. (*Batson*, 476 U.S. at 83, 100, 90 L. Ed. 2d at 78, 90, 106 S. Ct. at 1715, 1725.) While we agree with the State that the record must disclose the race of the veniremen in order to provide for

meaningful appellate review (see *People v. Wheeler* (1978), 22 Cal. 3d 258, 263 n.1, 583 P.2d 748, 753 n.1, 148 Cal. Rptr. 890, 894 n.1 (demonstrating how defense counsel may establish the race of a venireman on the record)), we disagree with the State insofar as it claims that the deficiencies in the original *voir dire* record in this case result in waiver of defendants' *Batson* claim. The precise purpose for which we remanded this case was to afford defendants an opportunity to substantiate their claim, in recognition of the substantially different evidentiary burden announced in the *Batson* decision. Furthermore, defendants in this case requested leave of court to establish the race of the venire and the jury on the record at the conclusion of *voir dire* and before the jury was sworn. The State prevailed in its objection to defendants' attempts to substantiate their claim, and cannot now be heard to complain that the issue has been waived because of a deficient record.

As previously stated, the United States Supreme Court has held that the equal protection clause forbids a prosecutor from peremptorily challenging potential jurors solely on account of race or on the assumption that black jurors as a group will be unable to impartially consider the prosecutor's case against a black defendant. (*Batson v. Kentucky* (1986), 476 U.S. 79, 89, 90 L. Ed. 2d 69, 83, 106 S. Ct. 1712, 1719.) *Batson* requires that a defendant first establish a *prima facie* case of discrimination. (476 U.S. at 93-94, 90 L. Ed. 2d at 85-86, 106 S. Ct. at 1721.) Once the defendant establishes a *prima facie* case, the burden shifts to the prosecution to come forward with race-neutral explanations for striking the black veniremen. 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712.

We first consider whether defendants established a *prima facie* case of discrimination under *Batson*. To establish a *prima facie* case, a defendant must first show

that the prosecutor exercised his peremptory challenges to remove members of a cognizable racial group from the venire and that defendant is a member of that group. (*Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87, 106 S. Ct. at 1723.) The defendant may then "rely on the fact *** that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate,' " in demonstrating "that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." *Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87-88, 106 S. Ct. at 1723, quoting *Avery v. Georgia* (1953), 345 U.S. 559, 562, 97 L. Ed. 1244, 1247-48, 73 S. Ct. 891, 892.

The *Batson* decision, as well as a prior case which *Batson* cited with approval, illustrate some of the circumstances which may raise an inference of purposeful discrimination. For example, "a pattern of strikes against black" veniremen may give rise to a *prima facie* case of discrimination. (*Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.) A *prima facie* case may also arise where the prosecutor exercises his peremptory challenges against a group of veniremen being otherwise "as heterogeneous as the community as a whole," sharing race as their only common characteristic. *People v. Wheeler* (1978), 22 Cal. 3d 258, 280, 583 P.2d 748, 764, 148 Cal. Rptr. 890, 905.

In this case, defendants established a *prima facie* case of discrimination. Defendants are black, which is a cognizable racial group. (*Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87, 106 S. Ct. at 1723.) The prosecutor exercised one of his 18 peremptory challenges to exclude one white venireman. The prosecutor then exercised a "pattern of strikes" which resulted in the exclusion of all 16 of the veniremen who were members of defendants'

race. (476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.) Moreover, the prosecutor's challenges resulted in all stricken veniremen being otherwise "as heterogeneous as the community as a whole," sharing race as their only common characteristic. (*Wheeler*, 22 Cal. 3d at 280, 583 P.2d at 764, 148 Cal. Rptr. at 905.) For instance, the veniremen the State peremptorily challenged ranged in age from 21 to 69 years old. Six of the veniremen were men and 10 were women. Some of these veniremen were single, while others were either married or widowed. Their diverse occupations included janitor and weekend musician, building engineer, and school bus driver. One stricken venireman was a student and another was a housewife.

The pattern of strikes the prosecutor exercised against these 16 black veniremen, coupled with the fact that they shared race as their only common characteristic, are relevant circumstances which establish a *prima facie* case of discrimination. *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723; *Wheeler*, 22 Cal. 3d at 280-81, 583 P.2d at 764, 148 Cal. Rptr. at 905.

The State contends that the trial court's finding that defendants established a *prima facie* case of discrimination was against the manifest weight of the evidence because the record does not support the trial court's finding that 16 black veniremen were peremptorily challenged. Only eight black veniremen who were peremptorily challenged testified at the *Batson* hearing, and the State asserts that our review of defendants' *Batson* claim is limited to a consideration of those eight jurors.

The fundamental flaw in the State's argument is that at the *Batson* hearing held pursuant to our supervisory order, the defendants' trial counsel were sworn and testified that the State peremptorily challenged all 16 black veniremen who remained after challenges for cause. Un-

der the circumstances, the trial court was plainly entitled to consider this evidence in determining that 16 black veniremen were peremptorily challenged. Based on the evidence presented at the *Batson* hearing, we decline to hold that the trial court's determination was erroneous.

Even assuming that our review were limited to the veniremen who actually testified at the *Batson* hearing, we would still be compelled to find that defendants established a *prima facie* case of discrimination. Our review of the record indicates that the heterogeneity of the stricken veniremen does not change by merely reducing their number by eight. Again, the pattern of strikes the prosecutor exercised against these eight veniremen, along with the fact that they share race as their only common characteristic, compels us to conclude that defendants established a *prima facie* case of discrimination. *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723; *Wheeler*, 22 Cal. 3d at 280-81, 583 P.2d at 764, 148 Cal. Rptr. at 905.

We next consider whether the trial court erred in finding that the prosecutor failed to articulate legitimate, race-neutral reasons for exercising his peremptory challenges to exclude the black veniremen. Once a *prima facie* case of discrimination is established, the State must come forward with race-neutral reasons for excluding the black veniremen. (*Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.) While the reasons need not rise to the level of a challenge for cause, a mere assertion of nondiscriminatory motive or of good faith in exercising challenges will not rebut a *prima facie* case. (476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712.) The prosecutor's explanation must demonstrate that the excluded veniremen exhibit a "specific bias" related to the particular cause to be tried, rather than the fact that their shared race with the defendant will bias them in fa-

vor of the defendant or render them unfit to serve on the jury. (476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712.) In reviewing the trial court's finding, we are mindful that a trial court's determination of purposeful discrimination is a finding of fact and will not be overturned on review unless it is found to be against the manifest weight of the evidence. (*Batson*, 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21, 106 S. Ct. at 1724 n.21 ("Since the trial judge's findings *** largely will turn on [an] evaluation of credibility, a reviewing court ordinarily should give those findings great deference"); *People v. Conner* (1979), 78 Ill. 2d 525, 532.) We have reviewed the prosecutor's proffered explanations for exercising his peremptory challenges and find them inadequate to rebut the *prima facie* case, in light of the characteristics of the white jurors whom the prosecutor accepted.

The prosecutor peremptorily challenged two black veniremen whose spouses are teachers allegedly because teachers and people who live with teachers "tend to use their own reasoning and not rely so much on the evidence and arguments presented by counsel." Nevertheless, the prosecutor accepted Muriel Brink, a white teacher. No explanation is offered for this patent inconsistency, and our review of the record reveals none.

The prosecutor's contention that he struck a 34-year-old black man because young single males are the "worst jurors" for a rape case is untenable since he accepted an 18-year-old white man to serve on the jury. Similarly, the prosecutor's claim that some of the black jurors were challenged because they were mothers of large families is belied by the fact that he accepted a white juror who was also the mother of a large family.

As previously noted, the prosecutor stated that veniremen with prior jury service could have preconceived notions regarding a case and are "time bombs in a case waiting to happen." Maryene Jones is a black

woman who stated during *voir dire* that she was on jury duty approximately four years before; she did not state whether she actually served on a jury. The prosecutor exercised a challenge to strike Mrs. Jones purportedly because of her prior jury service, yet accepted Winifred Mueller, a white venireman, who had actually served on two previous juries.

The prosecutor claimed that a nurse would not be an acceptable juror, and exercised a peremptory challenge to excuse a black nurse allegedly on that basis. Yet, the prosecutor accepted a white nurse's assistant, David Reiff, without explaining why a nurse's assistant would somehow be a more acceptable juror than a nurse.

Finally, the prosecutor struck 63-year-old Raymond Falconer and 69-year-old Lonnie Busby, allegedly based on their advanced age. Again, the prosecutor's explanation is inconsistent with his acceptance of Winifred Mueller, who is 67 years old. It is clear that the prosecutor's proffered reasons for the exclusion of black veniremen were not consistently applied between the challenged black veniremen and the white veniremen who eventually sat on the defendants' jury.

Based on the record, the trial court's implicit finding that the prosecutor's asserted reasons for excluding black veniremen were not credible was not against the manifest weight of the evidence. We therefore conclude that there was a violation of the *Batson* rule in the selection of the petit jury. In so concluding, we are mindful that " '[a] single invidiously discriminatory governmental act' " in the selection of the petit jury is all that is required to demonstrate a violation of the defendants' fourteenth amendment equal protection rights. (*Batson*, 476 U.S. at 95-96, 90 L. Ed. 2d at 87, 106 S. Ct. at 1722, quoting *Arlington Heights v. Metropolitan Housing Authority* (1977), 429 U.S. 252, 266 n.14, 50 L. Ed. 2d 450, 465 n.14, 97 S. Ct. 555, 564 n.14.) Defendants'

convictions must be reversed. *Batson*, 476 U.S. at 100, 90 L. Ed. 2d at 90, 106 S. Ct. at 1725.

Given our resolution of the *Batson* issue, we need not address the issue raised by defendant Hicks as to whether the physical evidence seized from him should have been suppressed; however, we must address defendant Hicks' contention that the evidence was insufficient to prove him guilty beyond a reasonable doubt. As this court stated in *People v. Taylor* (1979), 76 Ill. 2d 289, 309:

> "When an appellate court reverses a criminal conviction and remands the case for a new trial without deciding defendant's contention that the evidence at the first trial was insufficient, we believe that the court risks subjecting the defendant to double jeopardy. The United States Supreme Court has held:
>
> > 'The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding. This is central to the objective of the prohibition against successive trials.' (*Burks v. United States* (1978), 437 U.S. 1, 11, 57 L. Ed. 2d 1, 9, 98 S. Ct. 2141, 2147.)"

Defendant Hicks argues that the hair and saliva comparisons merely show that he cannot be excluded as a possible donor. Defendant asserts that the only evidence linking him to the crime are the fingerprints found on the victim's car. Defendant contends that this evidence is circumstantial, and that in order to sustain a conviction based upon circumstantial evidence, the State must demonstrate that the evidence is inconsistent with any reasonable hypothesis of innocence.

We do not agree with defendant Hicks that the evidence in this case is insufficient to support his convictions. The evidence shows that one of the assailants called the other "Mark," which is defendant Hicks' first name. The victim testified that while being assaulted by

one of the men, the others would stand behind the car, near the trunk area. Defendant Hicks' right palm print was found near the left side of the trunk lid. The victim further testified that her attackers asked her how to open the gas cap. Two of defendant Hicks' fingerprints were found on the left fender near the gas cap. Furthermore, there were no less than 23 of defendant Hicks' finger or palm prints on five different areas of the victim's automobile, which would exclude any possibility that they were inadvertently placed there during a brief and innocent encounter with the victim's car. The evidence presented was sufficient to support the conviction of defendant Hicks. In so holding, we in no way imply that we have made a finding as to defendant Hicks' guilt which would be binding on the court on retrial. *People v. Taylor* (1979), 76 Ill. 2d 289, 310.

For the reasons set forth above, we reverse the defendants' convictions and remand these causes to the circuit court of St. Clair County for a new trial.

*Nos. 63204 & 63240—Appellate court reversed;*
*circuit court reversed;*
*sentences vacated;*
*causes remanded.*

CUNNINGHAM and STAMOS, JJ., took no part in the consideration or decision of this case.