THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. THOMAS COOK, Defendant-Appellant.

Fifth District   No. 5—89—0598

Opinion filed August 8, 1991.

Daniel M. Kirwan and Rita K. Peterson, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Scott Mansfield, State's Attorney, of Belleville (Kenneth R. Boyle, Stephen E. Norris, and Diane L. Campbell, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LEWIS delivered the opinion of the court:

A jury found the defendant, Thomas Cook, guilty of first-degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)), rejecting his assertion of the presence of the mitigating factors of both serious provocation and unreasonable belief of justification. The trial court sentenced him to a term of 25 years in the Department of Corrections. The defendant appeals, raising five issues for our review: (1) whether the statutory procedure requiring the defendant to prove the existence of mitigating factors in order to be convicted of second-degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—2), rather than first-degree murder, is unconstitutional; (2) whether the defendant's constitutional right to equal protection of the law was violated where the State used four of six peremptory challenges to exclude four of five black persons from the jury; (3) whether the defendant proved by a preponderance of the evidence the mitigating factor of provocation in order to lessen the offense from first- to second-degree murder; (4) whether the trial court erred "when it allowed the jury to deliberate without written instructions"; and (5) whether the trial court erred when during sentencing it relied on the death of the victim as an aggravating factor.

■ Concerning his constitutional challenge, he contends that, because the defendant bears the burden of proving a mitigating factor in order to be found guilty of second-degree murder instead of first-degree murder, sections 9—1 and 9—2 of the Criminal Code of 1961 (hereafter referred to as the Code) violate the due process clause of the United States Constitution. However, the second-degree murder

statute has been challenged on due process grounds and has withstood the challenge. (*People v. Buckner* (1990), 203 Ill. App. 3d 525, 561 N.E.2d 335.) After that challenge the defendant in *People v. Jerome* (1990), 206 Ill. App. 3d 428, 564 N.E.2d 221, alleged that the statute violated due process because it impermissibly shifts the burden of proof to the defendant. Like the court in *Jerome*, we agree with the result reached in *Buckner*.

The court in *Jerome* explained the changes wrought by the amendment of the Criminal Code of 1961 in 1987:

> "The Criminal Code of 1961 was amended in 1987, and the offense of voluntary manslaughter was eliminated and replaced by that of second-degree murder. (Pub. Act 84—1450, §2, eff. July 1, 1987.) Under the new statute, a person commits second-degree murder when he commits first-degree murder and either of the mitigating factors (provocation or unreasonable belief) is present. (Ill. Rev. Stat. 1987, ch. 38, par. 9—2(a).) When a defendant is on trial for first-degree murder and evidence of either mitigating factor is presented, the burden of proof is on the defendant to prove the mitigating factor by a preponderance of the evidence before the defendant can be found guilty of second-degree murder; the State still has the burden of proving all of the elements of first-degree murder, however. Ill. Rev. Stat. 1987, ch. 38, par. 9—2(c); see also *People v. Shumpert* (1989), 126 Ill. 2d 344, 351-52[, 533 N.E.2d 1106] (discussing differences between voluntary manslaughter and second-degree murder statutes)." (206 Ill. App. 3d at 433-34, 564 N.E.2d at 224-25.)

Under the old homicide statute, the State had the burden to prove, beyond a reasonable doubt, the absence of the factor in mitigation. *People v. Shumpert* (1989), 126 Ill. 2d 344, 533 N.E.2d 1106; *People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141.

The due process clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." (*In re Winship* (1970), 397 U.S. 358, 364, 25 L. Ed. 2d 368, 375, 90 S. Ct. 1068, 1073.) On the basis of *In re Winship*, *Patterson v. New York* (1977), 432 U.S. 197, 53 L. Ed. 2d 281, 97 S. Ct. 2319, *Mullaney v. Wilbur* (1975), 421 U.S. 684, 44 L. Ed. 2d 508, 95 S. Ct. 1881, and *Martin v. Ohio* (1987), 480 U.S. 228, 94 L. Ed. 2d 267, 107 S. Ct. 1098, the *Buckner* court determined that the Illinois statute is constitutional, observing that section 9—2 of the Code does not require the defendant to prove any elements of first-degree murder and noting that the

jury does not even reach a consideration of second-degree murder until and unless it determines that the State has proved first-degree murder beyond a reasonable doubt. The court stated further in *Buckner* that section 9—2 does not present the constitutional problems found in the *Mullaney* statutes and that section 9—2 is similar to statutes approved by the United States Supreme Court in both *Patterson* and *Martin*.

In *Mullaney*, upon which the defendant herein relies, the Supreme Court held that the States cannot shift to the defendant the burden of proving an element of the crime charged. Later, in *Patterson*, the Supreme Court approved a New York statute that required a defendant charged with second-degree murder to prove by a preponderance of the evidence an affirmative defense of extreme emotional disturbance in order to reduce the crime to manslaughter. In *Patterson*, as in the instant case, the prosecution was required to prove all the elements of the crime charged; the burden then shifted to the defendant to prove the elements of an affirmative defense. The Supreme Court in *Patterson* declined

> "to adopt as a constitutional imperative, operative countrywide, that a State must disprove beyond a reasonable doubt every fact constituting any and all affirmative defenses related to the culpability of an accused. Traditionally, due process has required that only the most basic procedural safeguards be observed; more subtle balancing of society's interests against those of the accused have been left to the legislative branch. We therefore will not disturb the balance struck in previous cases holding that the Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged. Proof of the nonexistence of all affirmative defenses has never been constitutionally required; and we perceive no reason to fashion such a rule in this case and apply it to the statutory defense at issue here." *Patterson*, 432 U.S. at 210, 53 L. Ed. 2d at 292, 97 S. Ct. at 2327.

The instant defendant argues that this case is "clearly analogous" to *Mullaney* because the defendant is "required to prove an affirmative defense or mitigating factor which is inconsistent with, or would negate an element of[,] the offense charged." The defendant in *Jerome* likewise contended, without success, that the present statutory scheme is analogous to that struck down by the Supreme Court in *Mullaney*, urging that it violates due process by shifting the burden to the defendant to prove second-degree murder. Relying upon *Patter-*

*son,* the court in *Jerome* pointed out that under the statutory scheme in *Mullaney,* lack of provocation was an element of the crime of murder in Maine, whereas lack of provocation is not an element of the offense of first-degree murder in Illinois. Thus, the court in *Jerome* concluded, the Illinois statute does not suffer the constitutional infirmity present in the Maine statute considered in *Mullaney.*

As in *Jerome,* the instant defendant's argument relies heavily on *People v. Hoffer* (1985), 106 Ill. 2d 186, 478 N.E.2d 335. The defendant in *Jerome* contended, as the defendant here asserts, that *Hoffer* stands for the proposition that the mental states involved in murder and voluntary manslaughter are inconsistent. As a result, the defendant in *Jerome* concluded and the instant defendant argues, the mental states in first- and second-degree murder are inconsistent as well. Since "heat of passion" and the element of "malice" in the Maine statute were found to be impermissibly inconsistent in *Mullaney,* the defendant maintains that the Illinois statute is, likewise, unconstitutional. The court in *Jerome* found the defendant's reliance on *Hoffer* misplaced:

> "The inconsistency identified in *Hoffer* was in the guilty verdicts. The jury had been instructed that, in order to find the defendant guilty of murder, they had to find that he had not had an unreasonable belief in justification at the time of the killing; they were also instructed that, in order to find defendant guilty of voluntary manslaughter, they had to find that he had had that unreasonable belief; the jury returned guilty verdicts on both offenses. Under the instructions given in that case, the jury had found that the defendant both did and did not ɪ̈ꞁ ve an unreasonable belief in justification; the findings were logically inconsistent. Under those instructions, the mental states for murder and involuntary manslaughter were inconsistent. (106 Ill. 2d at 195[, 478 N.E.2d 335].) There is, however, no inherent inconsistency between the mental states for first- and second-degree murder.

> When a defendant is charged with first-degree murder, the State is required to prove death, causation and intent (or knowledge). (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a).) The defendant then has the opportunity to prove provocation or unreasonable belief in justification to reduce the offense to second-degree murder. (Ill. Rev. Stat. 1987, ch. 38, par. 9—2(a).) The existence of provocation or an unreasonable belief in justification, however, will not diminish or negate any of the proved elements of first-degree murder. The mitigating factor is a sep-

arate issue the existence of which the State is willing to recognize as a circumstance affecting the degree of culpability or the severity of punishment. See *Patterson*, 432 U.S. at 206-07, 53 L. Ed. 2d at 289-90, 97 S. Ct. at 2325." *Jerome*, 206 Ill. App. 3d at 436, 564 N.E.2d at 226.

For the reasons expressed, following *Buckner* and *Jerome*, we hold that section 9—2 of the Code, which requires a defendant charged with first-degree murder to prove a mitigating factor by a preponderance of the evidence in order to be convicted of second-degree murder, does not violate the due process clause of the United States Constitution.

■■ With respect to the second issue raised for review, whether the defendant's constitutional right to equal protection was violated by the State's use of four out of six peremptory challenges to exclude four out of five black persons from the jury, he contends that the State failed to provide race-neutral reasons for excluding the four black veniremen in violation of the requirement of *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, and *People v. McDonald* (1988), 125 Ill. 2d 182, 530 N.E.2d 1351. The United States Supreme Court held in *Batson* that a prosecutor cannot exercise peremptory challenges to exclude veniremen solely on account of race and that a defendant may show such purposeful discrimination based solely on the facts in his own case. (*People v. Evans* (1988), 125 Ill. 2d 50, 530 N.E.2d 1360.) *Batson* requires that a defendant first establish a *prima facie* case. Once a *prima facie* case of discrimination is established, the State must come forward with race-neutral reasons for excluding the black veniremen. (*McDonald*, 125 Ill. 2d 182, 530 N.E.2d 1351.) While the reasons need not rise to the level of a challenge for cause, a mere assertion of nondiscriminatory motive or of good faith in exercising challenges will not rebut a *prima facie* case. (*McDonald*, 125 Ill. 2d 182, 530 N.E.2d 1351.) Under *Batson*, the neutral explanation required of the State for excluding each black venireperson must be related to the particular case to be tried. (*People v. Harris* (1989), 129 Ill. 2d 123, 544 N.E.2d 357.) Once the State has come forward with its reasons for striking the venirepersons, the trial court must then determine whether the explanations are sufficient to rebut defendant's *prima facie* case. (*Harris*, 129 Ill. 2d 123, 544 N.E.2d 357.) To do so, the trial court must make a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case. (*Harris*, 129 Ill. 2d 123, 544 N.E.2d 357.) Because this determination is a matter of fact, turning largely on questions of credibility, the findings of the trial court must be af-

forded great deference and will be reversed only if they are against the manifest weight of the evidence. (*Harris*, 129 Ill. 2d 123, 544 N.E.2d 357.) If a prosecutor excuses one person and not another, it does not follow that this in itself shows that the prosecutor's explanation was pretextual. (*People v. Young* (1989), 128 Ill. 2d 1, 538 N.E.2d 453.) The exclusion of even one minority venireperson on account of race is unconstitutional and would require reversal of the defendant's conviction. *Harris*, 129 Ill. 2d 123, 544 N.E.2d 357.

In the instant case the trial court found that the defendant made a *prima facie* showing of racial discrimination "based on the fact that there were five blacks passed on with the exercise of peremptory challenges and that the State removed four of those blacks." The State tendered the following statement as its race-neutral rationale for the exercise of the peremptory challenges in question:

"Your Honor, at this time regarding Juror Number 4—and if I get out of order here, just let me know—but regarding Mr. Leddrew Johnson. He was excused by me based on his age, the fact that he was a man and the fact that he was single. That was likewise the reason why I excused Juror Number 6 in this case who was a white gentleman. Regarding I believe the next one was Elizabeth Ford. I was concerned about the fact that she had read about the case in the newspaper and on TV. And that along with the fact that she was a little bit older a woman than I would have preferred was the reason why I excused her.

Regarding Juanita Brown. She was unemployed. That was a factor I took into consideration and I was also thinking that their name is familiar to me and I don't know if I have encountered that in conjunction with reading other police reports that I was concerned that there may be something there that she had some association with being involved in criminal activity. That was my main concern because the name did sound very familiar for me and that was the reason why I excused her.

Regarding Mr. Denzmore, he was excused based on his age and primarily because in answering questions on voir dire [*sic*], he did not sound to me to be at all intelligent. He was, I felt, fairly inarticulate and I had difficulty in understanding what he said and excusing him was based on the fact that I had difficulty in understanding what he said in talking about the names of his children and how old they were.

I don't know if there was—I think that is it."

The State noted further that it had tendered Phyllis Henry, a black venireperson, who served as a member of the jury panel.

By way of response the defense stated in relevant part, "Your Honor, I would only like to point out for the record, two of the individuals accepted by the State, Juror 75 being John Eise, his age reflected on the sheet I believe is 67 years old and Juror Number 239, Ray Steinwagner, his age is reflected as being 52." To this the State responded:

"Regarding Mr. Eise, I would point out that he had prior jury service. He sat on a criminal case and returned a guilty verdict. I would note that he does have a relative who is a Belleville Police Officer and he has two girls who are close in age to the age of the victim in this case. I felt there were positive factors to be taken into consideration on him. With Mr. Steinwagner, he indicated that he knew Steve Mathis [a witness for the State] and I felt that may be of some benefit to me."

Finding that the State had met its burden of providing neutral, nonracial reasons for excusing the four veniremen, the trial court denied the defendant's motion to discharge the panel on the basis of a *Batson* violation:

"I believe that the State has presented the Court with neutral nonracial reasons for exercising those particular challenges which it did. Specifically the Court's observations with respect to Ruben Denzmore were in keeping with Miss Porter's [assistant State's Attorney's] observations that his educational level certainly appeared to be very limited. I would note on the printout sheet that is given here with the panel, it is noted that he has a fifth grade education. That would probably be somewhat in keeping with the level of education that he exhibited in the courtroom. I was also having trouble understanding what he was saying when he responded to questions that were proposed to him by the Court.

I do not believe that the State based the challenges on racial considerations and I will deny the motion to discharge the panel based on any violation of the Batson case."

■ The defendant contends that the trial court's finding that the State had provided race-neutral reasons for its exclusion of black venirepersons was in error and that the panel, therefore, should have been discharged. The defendant argues, *inter alia*, that "at least three of the blacks excluded possess similar characteristics to some white males who were not excluded." In *Young* the supreme court explained that, although a part of the prosecutor's explanations may have been applicable to white jurors who were not challenged, the white jurors may have, in some other respect, exhibited a trait the

prosecutor reasonably could have believed would make him or her desirable as a juror. In *Harris* the court noted that the converse is true as well, that is, although a minority venireperson may otherwise possess all of the traits which the State is looking for in a juror, he may possess an additional trait that makes him undesirable. The defendant argues further that "[t]he case at hand is similar to *Batson* in that it involves an interracial crime, a black defendant and a white victim. Obviously, this is a situation especially prone to prejudice." Bearing in mind the arguments advanced by the defendant and the applicable principles of law, we have carefully examined the entire record pertaining to *voir dire*. The record shows that the findings of the trial court were not against the manifest weight of the evidence. Hence, the trial court did not err in denying the defendant's motion.

With reference to the third issue he presents for review, the defendant contends that he proved the mitigating factor of provocation by a preponderance of the evidence and asks this court to reduce the offense of which he was convicted to second-degree murder. Section 9—2 of the Code provides in pertinent part:

"(a) A person commits the offense of second[-]degree murder when he commits the offense of first[-]degree murder as defined in paragraphs (1) or (2) of subsection (a) of Section 9—1 of this Code and either of the following mitigating factors are present:

(1) At the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed." (Ill. Rev. Stat. 1987, ch. 38, par. 9—2(a)(1).)

A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.) The evidence here is neither improbable nor unsatisfactory. The record reveals that the principal impediment to the defendant's success in persuading the jury of the presence of either mitigating factor was the variety of accounts he gave prior to trial as to how the victim was shot.

Much of the evidence was undisputed. Dr. Michael Graham, a forensic pathologist who had performed an autopsy upon the victim, Margaret Shepard, testified that she had two categories of wounds: (1) two gunshot wounds to the back of the head on the right and (2) "a bunch of scrapes and bruises," which were all superficial. All of the wounds appeared to be fresh. The gunshot wounds of the head

caused the victim's death. All of one bullet and part of another were recovered from her brain. Dr. Graham testified that "well above 90 percent" of people who sustained such gunshot wounds "would become unconscious essentially immediately." The witness indicated that neither gunshot wound was a "contact" wound: "In other words, the gun was not actually being held firmly against the scalp when the trigger was pulled. Other than that, I can't make any comments on range. It could be as far as the bullet could travel outside of contact range." The gun could, he said, have been close to the victim's skull but it would not have been in contact with it. The witness described the other wounds as follows:

> "In addition to the gunshot wounds, there were multiple bruises and scrapes primarily on the neck. There was also some bruising on the arms. There were some scrapes and bruises on the right hand and thumb around the base of the first finger and on the thumb. There was also a seven[-]inch scratch on the top front outside corner of the right thigh as well as some small scrapes and bruises on the knees."

The witness stated that the victim's lips also were bruised and torn.

The gun from which the bullets had been fired was found by a laboratory technician, William Brandon, "between the bed mattresses" in the master bedroom. Thomas Gamboe, Jr., a forensic scientist specializing in the area of firearm toolmark identification, testified that every time this gun fires the trigger has to be pulled and that the hammer block, which serves as the safety mechanism on the weapon, appeared upon testing to be operative.

■ The victim and the defendant lived together in a trailer. Just before midnight of November 22, 1988, officials received an emergency call concerning a shooting in the trailer. Steve Mathis, a deputy in the St. Clair County sheriff's department, testified that upon his arrival the defendant, when asked what had happened, "stated that he came home and found his girlfriend in bed; that she had been shot or she had shot herself." The witness testified further:

> "At that time, we asked him where the weapon was and he stated it might be in the hallway. As to why it was in the hallway, Sergeant Cooper asked him why it was in the hallway he stated that is where she shot herself. There was an argument and she shot herself. And we couldn't locate the weapon anywhere."

The witness said that the defendant indicated that he and the victim had an argument. The witness said further that the defendant was then apprised of his *Miranda* rights and was asked "the whole situa-

tion of what happened," to which question the defendant responded that "he came home; that his girlfriend met him at the front door; and that they walked into the hallway and started arguing; and that she pulled the weapon up and shot herself." Later, the witness testified, the defendant

> "stated in the interview room three that she met him at the front door. His mother had dropped him off. They were walking into the hallway. They were arguing. She said she was tired of it. She wouldn't put up with it no more. She pulled a weapon up. He said a [.]22 caliber. They started struggling over the weapon and he said it went off three or four times."

The witness stated that he believed the defendant "did have a scratch mark on the side of the neck," which was not bleeding. On cross-examination this witness stated that the defendant had said that the gun "was in the hallway. It should be in the hallway. He didn't know for sure where it was." The witness never saw a gun either in the hallway or in the trailer.

A paramedic, Earl Bohn, testified that upon knocking on the door, in response to the emergency call, "[w]e was met by a black male who said his girlfriend had shot herself." They found the victim, the witness said, "lying on the floor." Only the victim and the defendant were in the trailer when the witness arrived there. The victim was at that time apparently still alive but unconscious and died some hours later.

Richard Scott, a sergeant for the St. Clair County sheriff's office, interviewed the defendant at about 3 a.m. on November 22, 1988. At that time he observed no physical injuries on the defendant's person. The written statement the defendant made to this witness was admitted into evidence and read into the record:

> "On Monday, November 21, 1988, I, Thomas E. Cook, was dropped off at home by my mother whose home I had been at visiting. I believe it was around 9:30 p.m. I knocked on the door and after a few moments, my live-in girlfriend Margaret Shepard answered the door. Once I entered the house, Margaret and I got into an argument because I didn't come straight home after work. We began to yell at each other while standing in the living room. Then we went into the hallway by our bedroom. As we yelled at each other, Margaret pulled out a [.]22[-] caliber gray[-]in[-]color handgun and told me she wasn't going to take it anymore. She pulled the hammer back on the gun and when I observed this, I grabbed a hold of the gun. We began to fight over the gun and after a few seconds the gun fired

several times. I don't know that the gun was in my hand or hers or both of our hands.

She then fell to the floor in the hallway. I saw blood on her and on the floor but I didn't know if she was shot. I then pulled her into the bedroom where I started pouring water all over her. She was not waking up so I dialed 911 ***. I stayed home until the ambulance and police arrived. I do not know what happened to the gun but I believe it is still somewhere in the house."

Michael Weaver, a corrections counselor, testified that the defendant had talked to him as follows:

"We met in an interview room when we spoke there. And I inform all the detainees at the present time that if they are going to hurt themselves, if they tell me about the crime, then the appropriate authorities will have to be alerted to that fact. And we talked about the crime that he committed that particular time of how he walked away from—there was a struggle for a weapon, for a gun and he somehow got the gun, walked down a hallway or a room and turned and fired the gun and it went off accidentally a few or several times."

The defendant had, the witness said, acted the incident out for him: "He walked away. As he walked, he got up from the chair that was sitting across from me from the table and he walked towards the door in the interview room and he put his hands out and he said he turned and fired." On cross-examination the witness indicated that the defendant had stated that the victim had the gun first.

The defendant did not testify or call any witnesses.

The evidence speaks for itself. The jury could well have believed that no serious provocation had occurred. In the absence of any basis in the record for setting aside the defendant's conviction for first-degree murder, we do not disturb it.

We turn to the fourth issue for our review, that pertaining to the jury's deliberations. At the hearing on defendant's post-trial motion, the trial court stated its recollection of events relating to the giving of oral and written instructions to the jury:

"[M]y recollection is simply that when I was reading the instructions to the jury, I noted an error in one of the written instructions. I modified it orally when I read to the jury that particular instruction and subsequent to that, I had that particular instruction retyped and then it was given to the jury. So I just want to clear up the record in that regard.

My understanding is clearly that there was absolutely no difference from the instructions that were read to the jury and the instructions they received in written form."

It is undisputed that the oral instructions given by the trial court were identical to the written ones received by the jury after they had retired to deliberate. The trial court observed further that

"[c]oncerning the period of time between when the jury was instructed and the jury returned its verdict, the docket minutes filed on July 12th would indicate that the jury retired to deliberate its verdict at 2:47 PM and at 3:50 PM the jury returned its verdict. Some period of one hour. I understand that the defense counsel's time frame that he is using is from the time that all of the written instructions were given to the jury and return, and I think it was probably a little bit more than certainly 10 minutes but it was certainly less than the period of one hour.

But nonetheless, during that period of time, I would want to note that while the jury did not have the written instructions for some period of time, they had been orally instructed as to the law and they had in my estimation properly been instructed as to the law."

Earlier defense counsel had described his recollection of these events:

"[M]y recollection of the events was we read instructions to the jury which had the deleted element from the patterned jury instruction and at that point I went down to my office, spoke with Bonnie Nesbit and Alison Dickerson in an attempt to prepare the written jury instruction to coincide with that oral instruction. Those instructions were brought back up here. There were further changes made. I believe the Court Reporter typed them. It was a considerable period of time. We finally got the written jury instructions to the jury panel and within a matter of a few minutes, the jury returned a verdict. I believe it was only about 10 minutes at the most, 15 minutes after they received the written jury instructions."

The trial court denied the defendant's post-trial motion.

██ The defendant seeks a new trial because, he asserts, allowing the jury to deliberate without instructions "for any length of time" was error. In his brief he states that "between twenty and thirty minutes passed during which the jury deliberated without the written instructions. *** After ten or fifteen minutes with written instructions, the jury then rendered a verdict of guilty of first-degree murder." He

relies heavily upon *People v. Cadwallader* (1989), 181 Ill. App. 3d 488, 536 N.E.2d 1319, in which the defendant contended that the trial court had committed plain error when it allowed the jury to deliberate for slightly more than one-half hour without the benefit of instructions. In *Cadwallader*, however, the jury deliberated without the written instructions for a period of time after having been inaccurately instructed orally. The oral instructions omitted an essential element of the offense of theft. After receiving them, the jury was permitted to deliberate without written instructions to guide it for 35 minutes out of a total deliberation time of 72 minutes. The *Cadwallader* court observed that the function of the instructions is to convey to the jurors the correct principles of law applicable to the facts so that they can reach a correct conclusion according to the law and the evidence. The jury in *Cadwallader* was, the court stated, erroneously left to its own speculation and improvisation concerning the elements of the crime charged. Further, there were only two witnesses who provided evidence of the defendant's guilt; both of these witnesses had admittedly taken part in the crimes with which the defendant was charged. The court concluded that in order to weigh fairly the testimony of these two witnesses against the testimony of the defendant's alibi witnesses, the jury should have had before it the written accomplice instruction. "On these facts" the court said, "we consider it plain error for the jury to have also been deprived, for any amount of time, of the essential instructions that would have explained the elements of the crimes charged, the presumption of innocence, and the burden of proof." (*Cadwallader*, 181 Ill. App. 3d at 503, 536 N.E.2d at 1329.) The court noted further in *Cadwallader* that there was some indication in the record on appeal that the jury had concluded that the defendant was guilty before it had examined the written jury instructions. Summarizing, the court determined as follows:

> "Without placing undue emphasis on that fact, we find the other factors, *i.e.*, improper oral instruction, partial deliberation without written instructions, and the presentation of a substantial defense, combine to constitute plain error in the instruction of the jury in this case. Fundamental fairness and the 'interests of justice' require that defendant be awarded a new trial." *Cadwallader*, 181 Ill. App. 3d at 503, 536 N.E.2d at 1329.

In the instant case, there is no indication in the record that the jury had concluded that the defendant was guilty prior to receiving the written jury instructions. Further, the oral instructions were proper, and the defendant did not present a substantial defense. In

fact, the evidence against this defendant was overwhelming, whereas "[t]he relative closeness of the evidence" (181 Ill. App. 3d at 503, 536 N.E.2d at 1328) compelled the court in *Cadwallader* to scrutinize carefully the instruction procedure in the trial court. The only factor present in the instant case similar to those factors considered in *Cadwallader* was the partial deliberation by the jury without written instructions. In light of these important differences between the instant case and *Cadwallader*, we hold that error, if any, was under the circumstances harmless.

The defendant's fifth and final assignment of error pertains to the trial court's consideration of the death of the victim as a factor in aggravation during sentencing. In imposing sentence, the trial court observed in part:

"The PSI [Presentence Investigation Report], I think at least as the attorneys are aware, indicate[s] at least a minimum of 10 prior misdemeanor convictions. I am certainly aware that none of his prior convictions are for felony offenses but it does tend to show some disregard for our [S]tate's criminal laws. As Miss Porter indicated, six of those, no less than six of those convictions were for the offense of either obstructing or resisting a Police Officer. I believe one of those might have been for the court supervision but in any event, at a minimum, the defendant has either pled guilty or been found guilty of obstructing or resisting a Police Officer.

I have gone over the statutory factors in mitigation. None of those that are listed in the statute would appear to apply specifically to this defendant and the situation that I am confronted with this afternoon. But I will say in his favor that not only today but in previous court hearings, I believe he has indicated remorse for the events that led to the death of the victim and I believe that that remorse is sincere today, and I think it has been throughout the proceedings.

On the other hand, as far as factors in mitigation [*sic*], certainly by definition of the offense, the defendant caused the death of another individual. As I have made reference to, the defendant does have a history of prior criminal activity albeit of a misdemeanor nature. And I also am of the opinion that I believe that a sentence is necessary to deter others from committing a similar offense.

As so often is true in these cases, I think probably that a proper sentence is somewhere in between what the State is seeking [35 years] and what the defendant is asking [20 years].

When I came out to the courtroom today, I was of the opinion that a sentence of 25 years in the Illinois Department of Corrections was a proper sentence. I listened to the evidence this afternoon with an open mind and, quite frankly, I have not been persuaded either way to change that sentence.

So for the reasons given, I am going to sentence the defendant to a determinant [*sic*] term of 25 years in the Illinois Department of Corrections."

■ A sentence based on improper factors, such as death as an aggravating factor when implicit in the offense, cannot be affirmed unless the reviewing court can determine from the record that the weight placed on such an improperly considered aggravating factor was so insignificant as not to lead to a greater sentence. (*People v. Colclasure* (1990), 200 Ill. App. 3d 1038, 558 N.E.2d 705.) Not every reference involving a factor implicit in an offense, however, gives rise to reversible error. (*Colclasure*, 200 Ill. App. 3d 1038, 558 N.E.2d 705.) The sentence of 25 years' imprisonment that was imposed in the instant case falls within the range of 20 to 60 years' imprisonment for a conviction of first-degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(1); see *Colclasure*, 200 Ill. App. 3d 1038, 558 N.E.2d 705). Although the trial court here may have considered the death of the victim as an aggravating factor—and it is not altogether clear that it did so—we think that, in view of the relatively light sentence imposed, the other factors in aggravation considered by the trial court, and the further considerations articulated by the trial court, any weight that might have been placed on the factor of the death of the victim was so insignificant that it did not lead to a sentence greater than would otherwise have been imposed. The trial court's sentencing determination is entitled to great weight and, absent an abuse of discretion, will not be overturned. (*Colclasure*, 200 Ill. App. 3d 1038, 558 N.E.2d 705.) The record taken in its entirety, including not only the considerations expressed at the sentencing hearing but also the circumstances associated with the commission of the crime, indicates that the trial court did not abuse its discretion in imposing sentence. Therefore, we will not overturn it.

The judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

HARRISON and HOWERTON, JJ., concur.