THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
TERRI L. WILLOUGHBY, Defendant-Appellant.

Fifth District    No. 5—91—0888

Opinion filed September 17, 1993.—Rehearing denied October 14, 1993.

Daniel M. Kirwan and Rita K. Peterson, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Douglas E. Dusek, Special Prosecutor, of Belleville (Norbert J. Goetten, Stephen E. Norris, and Scott A. Manuel, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LEWIS delivered the opinion of the court:

Defendant, Terri Willoughby, was convicted by a jury of the offense of first-degree murder. The circuit court entered judgment on the jury's verdict, and following a hearing on defendant's post-trial motion and sentencing, the court sentenced defendant to 30 years' incarceration. Defendant appeals. We affirm.

On appeal, defendant raises three main issues: (1) that the court erred in denying her motion to suppress statements, (2) that the State unconstitutionally exercised its peremptory challenges to exclude blacks from the jury, and (3) that she was denied a fair trial when the court admitted evidence of another crime, as it had no probative value and was highly prejudicial. In the defendant's first issue regarding her motion to suppress statements, she presents the following three subissues: (a) that her statements were made pursuant to an illegal arrest, thereby tainting her statements to the police, (b) that her statements were elicited by police interrogation after she had exercised her right to have counsel present, and (c) that without her confession the evidence was insufficient to prove her guilty beyond a reasonable doubt. In order to consider defendant's contentions regarding her confessions, we must consider the evidence presented at her suppression hearing and at trial, for in reviewing the propriety of the

court's rulings on the admissibility of defendant's confessions, a reviewing court may also consider the evidence adduced at trial. *People v. Case* (1991), 218 Ill. App. 3d 146, 577 N.E.2d 1291.

With the exception of Special Agent Clarence Banks, all of the witnesses who testified at the hearing on the defendant's motion to suppress also testified at trial. Senior Agent Craig Koehler from the Illinois State Police, Division of Criminal Investigation (DCI), testified that on September 7, 1990, around 9 or 9:30 a.m., he and Special Agent Brueggemann went to the residence of Hattie Haney (Hattie) to investigate her murder. Koehler observed that only one room in the house had been ransacked, the southwest bedroom. This evidence led Koehler to believe that the murder was committed by someone who had knowledge of where Hattie kept her money.

Koehler left Hattie's residence shortly before noon and went to defendant's residence, whose backyard was adjacent to Hattie's backyard, separated only by an alley. Defendant was not at her home, but her "mother-in-law," Louise Keith, was at defendant's residence. Louise told Koehler that she had seen defendant at the house of defendant's sister, Teresa, that morning. Louise and defendant had fought over possession of the car of Louise's son (defendant's common-law husband) and over money owed to Louise by her son, which defendant had taken from Louise's son. Louise told Koehler that, after the argument, defendant took a gun out of the car and some boxes out of the trunk, ran behind her sister's house, and threw these items into the weeds.

While at defendant's home, another of defendant's sisters, Valerie Hych, defendant's aunt, and a cousin also arrived. Agents Kuba and Snoke also came to defendant's home while Koehler was still there. These agents told Koehler about their interview with defendant's "husband" and that the information obtained from defendant's "husband" verified what Koehler had learned from Louise. Koehler testified that the reason the police wanted to interview defendant was because defendant was a neighbor and friend of Hattie; because of a home invasion which had occurred at Hattie's home on June 28, 1990, in which defendant was also involved; and because of the information Koehler had obtained from Louise regarding her fight with the defendant and the removal of items from defendant's car which were thrown behind defendant's sister's house.

Koehler explained the significance of the prior home invasion of Hattie's residence. Koehler had interviewed Hattie at the time of the home invasion, and he stated he suspected defendant of being involved in that crime even though she claimed to be a victim. Koehler

stated that his investigation of the home invasion revealed that defendant had come to Hattie's home at about 5:30 a.m. to use the telephone to make a doctor's appointment. Defendant was about six months pregnant and was not feeling well. After making the phone call, defendant left the house through the back door to get some medication she needed from her car. Defendant then returned to Hattie's home to take the medication instead of going to her own home, even though defendant lived behind the victim. Defendant and Hattie talked a few minutes, and as defendant went out the back door, a black man pushed defendant back inside the house. The man took defendant's billfold and asked Hattie if she had any money. When Hattie said she did not, the black man threatened to harm Hattie and defendant, so Hattie said she would give him her money. Hattie went to the southwest bedroom and took $150 from a wallet on her dresser. After the man left the house, defendant tried to call the police from a neighbor's house as Hattie's phone had been ripped out of the wall at the time of the robbery. The neighbor did not respond to defendant's knock so defendant returned to Hattie's house. Hattie gave defendant a quarter to go to a pay phone to call the police. Defendant told the police that when she got into her car to go to a pay phone, she saw the man who robbed them get into a car. Defendant followed the car for a short distance and attempted to memorize the license plates. Defendant gave the police the license plate number, and when the license plate number was checked, it was found that there was no such license plate number registered. Defendant told the police that she had $320 stolen in the robbery, but Hattie told Koehler that defendant had told her that she had $50 stolen. Because of the discrepancy of the amount of money defendant allegedly had stolen during the robbery, because the license plate number given by defendant was not on file, because of the 5:30 a.m. call allegedly made by defendant to make a doctor's appointment, and because of defendant's return to Hattie's to take medication when it was just as convenient for her to return to her home to take the medicine, Koehler suspected defendant's involvement in the home invasion. However, defendant was not charged with this crime.

After leaving defendant's home on the morning of September 7, 1990, Koehler and Brueggemann went to the apartment building of defendant's sister, Valerie, in search of defendant. Koehler saw that defendant's car was parked in the parking lot, and Valerie came out of the building and told Koehler that defendant was in Diane Howard's apartment and that she would be down in a minute.

When defendant emerged from the apartment building, Koehler told defendant about Hattie's death. He asked defendant if she would be willing to come to the police headquarters in Collinsville, Illinois, as they needed to find out what she knew about this crime. Defendant agreed to go with them. Valerie told the officers that she would drive defendant's car to the police headquarters, and defendant agreed to this. En route to police headquarters, Koehler advised defendant of her *Miranda* rights. Koehler then asked defendant what clothes she had been wearing earlier that day, and defendant told him. Koehler asked defendant if she would give him the clothes that she had worn earlier, and defendant agreed to do so. Koehler asked defendant no other questions. Upon arriving at police headquarters, defendant's car was secured inside the sally port.

Koehler and Brueggemann next accompanied defendant to her home to obtain the clothes she had been wearing. According to Koehler, he had returned defendant's keys to her, and she opened the door of her home. Koehler and Brueggemann went inside the house with her and walked from the living room into the kitchen, where they waited for her to return with her clothes. No search was made of defendant's home, and upon retrieving her clothes, defendant again agreed to return to police headquarters to be interviewed. Koehler testified that defendant asked him what information she might have, and Koehler told her that because of her involvement in the previous home invasion and because she was a neighbor and friend of Hattie's, they wanted to know if defendant had any ideas or information about her death.

Koehler, Brueggemann, and defendant arrived back at police headquarters at about 2:30 p.m. Upon arriving, defendant asked to talk to her attorney, Kevin Hoerner. Defendant gave Koehler Hoerner's telephone number, and Koehler dialed the number and gave the phone to defendant. Koehler heard defendant tell Hoerner that the police wanted to talk to her about Hattie's death since she was a neighbor of Hattie's and that she was not involved in the crime. Defendant then handed the phone to Koehler and said Hoerner wanted to talk to him. Hoerner asked Koehler if defendant was going to be held overnight, and Koehler told Hoerner he did not know, as he had not talked to defendant yet and did not know what she may say. Koehler stated he asked Hoerner if it was okay to give defendant her *Miranda* warnings and, if defendant agreed, if it was okay for defendant to talk to them. Hoerner told Koehler that was fine and asked to talk to defendant again. Koehler then gave the phone back to defendant. Koehler denied that Hoerner advised him that his firm

represented St. Clair County and that it would be a conflict of interest for Hoerner to represent defendant. After talking with Hoerner, defendant never asked if she could leave.

Koehler gave defendant her *Miranda* warnings a second time at about 2:50 p.m., after she got off the telephone. Either after defendant was read all of her rights or after she had been advised that she had the right to remain silent, defendant asked Koehler if she had to answer a question if she did not want to answer. Koehler explained to her that her rights remained throughout the interview, that she did not have to answer any questions, and that she could stop the interview at any time. Defendant then signed a rights-waiver form. Koehler took a written statement from defendant, which Koehler read back to her and which she signed at about 4:19 that afternoon.

In defendant's written statement, which was read to the jury, she told Koehler and Brueggemann that she last saw Hattie about 1:15 p.m. on September 6, 1990. At that time, Hattie gave defendant some newspapers which Hattie saved for her, and Hattie also loaned defendant some money. Defendant's common-law husband, Stanley Shannon (Stanley), got off work at about 3:30 p.m. that day, and because he had been paid, they went shopping with their two children. Eventually, defendant and Stanley and the children arrived at the housing projects in Centreville, Illinois, where they spent the evening. They returned home at about 10 or 10:30 that night. Stanley fell asleep, and defendant took her daughter to get a geography book from a friend's house, stopped by her sister Teresa's home, and returned home and finished cooking dinner. They ate dinner and then everyone went to bed at about 11:30 p.m. Defendant further stated in her written statement that she did not get up until about 6 a.m. the morning of September 7, 1990, when Stanley rose to go to work. Defendant drove Stanley to work but stopped by Teresa's house on the way back and woke Teresa up.

While defendant was at Teresa's house, Louise arrived there with defendant's two children. Louise wanted to take Stanley's car to him, and defendant got into an argument with her over this. Defendant told Koehler that following her fight with Louise, she reached under the driver's seat, removed a black revolver she had borrowed from a friend, and stuck the revolver in the front of her pants since she did not have any pockets. Defendant left Teresa's house and walked to the friend's house to give the gun back to her. When defendant returned to Teresa's house, her nephew, Juan, reconnected Stanley's car as Louise had had someone "unhook" it so that defendant could not drive away. Defendant then drove her son and her two nephews

to school. She returned home, changed her clothes, and went to Centreville to "Niecey's" home since her sister Valerie, who also lived in the same apartment building in Centreville, was not at home.

Shortly after noon, Valerie came by Niecey's apartment and gave defendant Koehler's card. Valerie told defendant Koehler wanted to talk to her and that defendant should call him. However, a few minutes later, Koehler and Brueggemann arrived, and defendant went outside to talk to them, whereupon she agreed to accompany the officers to Collinsville to talk to them about Hattie's death.

Also in defendant's written statement, defendant said she agreed to give Koehler and Brueggemann the clothes she had worn earlier and took them to her home to get the clothes. She further stated that she had never taken anything from Hattie's home and that Hattie had never given her anything other than newspapers and money.

At the conclusion of defendant's written statement, Koehler advised defendant that there were discrepancies between her written statement and what they knew had happened. Koehler testified that, at the time of defendant's written statement, they had already learned from Louise that defendant had removed items from the trunk of Stanley's car and thrown the items behind Teresa's house, and they also knew from Stanley that defendant was not home and that Stanley's car was gone when he got up to go to work that morning. Koehler told defendant that Brueggemann would tell her about the discrepancies, and then Koehler left the interview room for approximately 10 minutes. During that time, Koehler made a couple of phone calls and asked Agent Banks if he would sit in on the interview with defendant, which Banks agreed to do.

When Koehler returned to the interview room, he asked defendant if there was another story and she admitted there was. Defendant then made an oral statement, in which she stated that she had left her home at about 1 a.m. on September 7, 1990, after Stanley had fallen asleep. She ran into a man she knew as "Lowdown" (later determined to be Larry Sanders). Defendant told Koehler that she had discussed robbing Hattie's house with Lowdown about a week before and that they again discussed robbing Hattie on September 7, 1990, in order to obtain money to purchase drugs. Defendant agreed to drop Lowdown off about a block from Hattie's home and gave Lowdown a gun for the robbery. Defendant told Lowdown that Hattie kept her windows open in summer and that access into the house would be easy, that Hattie would be at home, as Hattie only left her house on Wednesdays and Sundays, and that Hattie kept her money in the back bedroom. When defendant dropped Lowdown off at about

4:15 a.m., she told him she would drive over to the apartments on 41st Street and park, which she did. A few minutes later, Lowdown came running up to the car with a "fist full" of $20 bills and a bag. Lowdown asked defendant to keep the bag of "stuff" he had removed from Hattie's home for him. Defendant and Lowdown then took $200 of the money taken from Hattie's home and purchased cocaine.

Defendant went to Teresa's home at about 6:30 a.m., and at 8 a.m., Louise showed up at Teresa's house. Defendant again reiterated that she and Louise fought over Stanley's car, during which time someone called the police. Defendant told Koehler that she panicked, got the bag of items Lowdown had given her from the trunk of Stanley's car, and ran behind Teresa's house and threw the items in the weeds. Defendant told the officers that two of the items she retrieved from the trunk were a grey metal box with some papers inside and a wooden jewelry box. Defendant also threw a knife into the weeds as she saw that the knife had blood on it, and when she saw that, she knew that Hattie had been stabbed or was dead.

Defendant also told the police in her oral statement that Lowdown was the man who had committed the home invasion in June 1990. She admitted that she was involved in planning and committing the robbery. Defendant then agreed to take Koehler and Brueggemann to where she had thrown the knife, which was behind Teresa's house. Defendant's oral statement followed her written statement within 10 to 15 minutes. Koehler did not reduce defendant's oral statement to writing at this time as it was beginning to get dark and they wanted to retrieve the knife from where defendant had thrown it.

On the way to Teresa's house to find the knife, defendant told the officers she had lied about where the knife was and that the knife was actually in a trash can behind Niecey's apartment in Centreville. Defendant directed Koehler and Brueggemann to the trash can behind the apartments. Because it was dark and the neighborhood was not a good one, Koehler did not want to endanger defendant's or their safety by stopping with only two officers. Koehler radioed for assistance, and they proceeded to the Centreville police department. On the way to the Centreville police department, defendant again requested to talk to her attorney, Kevin Hoerner. The officers' attempt to reach Hoerner by their car phone was unsuccessful. At the police station, defendant again tried two or three times to contact Hoerner, both at his office and at home, but she was unable to reach him. At the police station, defendant asked to use the bathroom, and she was granted her request. Following discussion at the police station, Koehler de-

cided that they could not ask defendant any further questions, as she had asked to talk to her attorney and was unable to do so, and that to proceed with an interview would violate her rights. Koehler then placed defendant under arrest for Hattie's murder at about 7:30 that evening, and no further questions were asked of defendant.

Koehler also testified that neither defendant nor Hoerner was ever told that she was a suspect in Hattie's murder. Additionally, defendant was never placed in handcuffs or left alone after being picked up at 1:30 that afternoon. Further, at no time during her written statement did defendant ask to have an attorney present or to consult with an attorney, and she did not invoke her right to remain silent. Koehler testified that defendant was not coerced and that no promises were made to induce her statements. Koehler did not believe defendant to be under the influence of any drugs at the time of her statement. Even though defendant was eight months pregnant, she did not indicate that she was suffering any discomfort, and she did not ask for food.

After defendant was arrested and had left with Agent Brueggemann to go to St. Clair County jail, Koehler and Agents Banks and Morgan went to the trash can in Centreville to search for the knife. Their search revealed that the trash can was completely empty. Koehler notified another agent, Dennis Kuba, that the knife used in the murder of Hattie may be in the weeds behind Teresa's house.

Charles Brueggemann, a senior agent with the Illinois State Police, DCI, also testified at both the hearing on defendant's motion to suppress and at trial. He testified that he and Agent Koehler investigated the murder of Hattie Haney on September 7, 1990, and that he and Koehler had also investigated the home invasion at Hattie's residence on June 28, 1990. Brueggemann's testimony was essentially the same as Koehler's as to the prior home invasion and as to his and Koehler's investigation of Hattie's murder and defendant's questioning and subsequent arrest. In addition to Koehler's testimony, Brueggemann testified that defendant's demeanor in the car en route to the police headquarters in Collinsville was calm but concerned. Brueggemann did not believe defendant to be under the influence of any drugs when they picked her up, as her speech was coherent and she appeared to understand her rights. Brueggmann stated that during the taking of defendant's written statement by Koehler, he left the interview room for a phone call.

Brueggemann further testified that when Koehler left the interview room at the conclusion of defendant's written statement, he advised defendant of the discrepancies between her statement and other

information they had received in the course of their investigation. Brueggemann told defendant that Louise had told the police that defendant had Stanley's car at Teresa's house, that Louise saw defendant with a weapon that morning, that Louise saw defendant remove items from the trunk of Stanley's car and throw the items behind Teresa's house, and that defendant had not been at her home that morning when Stanley awoke for work. Brueggemann also told defendant that he had learned, through the phone call received during her written statement, that among the items found behind Teresa's house were documents with Hattie Haney's name on them. Defendant then admitted that some of the information in her written statement was incorrect.

Brueggemann also testified that defendant did not ask to leave at any time during their questioning and that she did not tell them her attorney had said she was free to leave. Similarly, defendant was never told she could not leave. Brueggemann denied that Koehler told defendant that she would be arrested if she left. Defendant never told Brueggemann or Koehler that Hoerner could not represent her as he worked for the State and it would be a conflict of interest for him to handle her case. According to Brueggemann, defendant was never left alone.

The only other evidence presented by the State at the hearing on the motion to suppress was the testimony of Clarence Banks, another special agent for the Illinois State Police. He testified that he sat in on defendant's interview at the police headquarters for about 10 or 15 minutes while Brueggemann questioned defendant about some of the details of the murder. While Banks was present, defendant did not ask for an attorney or invoke her right to remain silent.

Defendant presented the testimony of Valerie Hych and Anthony Hych both at the hearing on the motion to suppress and at trial. Valerie's testimony at the two proceedings was that on September 7, 1990, she received a call from her aunt, who had received a call from her sister Teresa. Teresa asked her aunt to come to her house as defendant and Louise were involved in a fight. Valerie's aunt picked her up and they went to Teresa's house; however, defendant was not there when they arrived, but she returned to Teresa's before Valerie left. Valerie next saw defendant at about 12:45 p.m., at Diane Howard's apartment. Valerie's apartment was in the same building as Howard's apartment. Valerie was first told that defendant was not in Howard's apartment when Valerie knocked on the door, but when defendant realized Valerie knew she was there, she talked to Valerie. Valerie gave defendant Koehler's card, which she had gotten from

him at defendant's house earlier that morning, and told defendant that DCI wanted to talk to her.

Valerie was present when Koehler and Brueggemann picked defendant up in front of her apartment building. She drove defendant's car to police headquarters and pulled it into the garage there. Valerie stated that when she did this, defendant walked over to her and asked her what the police wanted with her, whereupon Koehler told defendant she could not talk to Valerie.

Valerie testified that when she saw defendant that morning at Teresa's between 8:30 and 9 a.m., defendant was "high." She stated that defendant's eyes were red and blurry and that her speech was slurred when she talked. Valerie did not know whether defendant had had any sleep the night before. Valerie further stated that defendant's demeanor when she was high was the same as when she was not high, *i.e.*, she was a fun, loving person. Valerie was aware that defendant sometimes stayed out all night when she got high.

Anthony Hych testified that he is defendant's brother. He, too, saw defendant between 9 and 9:30 a.m. on September 7, 1990. That morning, defendant came to the house of Anthony's girlfriend to obtain a key to his apartment, which he shared with his sister Valerie. According to Anthony, defendant was high, as her eyes were blurry and "bugged." Anthony also stated that defendant acted normal when she was high.

Tony DuBerry, defendant's cousin, testified at the motion to suppress that he had seen defendant about 8:30 to 9 a.m. on September 7, 1990. It was his opinion that defendant was high as her eyes were red and her speech was "dragging."

The only other witness to testify at the motion to suppress was defendant. She also testified at trial. Defendant stated that on September 7, 1990, she lived behind Hattie Haney, and that their backyards were separated by an alley. Defendant had lived in this house for 13 years, and Hattie had been there the entire time. Defendant and Hattie began talking to each other over the fence when Hattie was outside working in her yard, which she did every day. The first time defendant was on Hattie's property was when defendant wanted to buy a car belonging to Hattie's grandson. After that, defendant went over to Hattie's and talked with her about once a week. Defendant and Hattie liked each other, and Hattie told defendant quite a bit of history about the neighborhood. Defendant's "husband," Stanley, would talk to Hattie over the fence, and sometimes he gave Hattie vegetables out of his garden; however, neither Stanley nor defendant's two children had ever been inside Hattie's house.

Defendant explained that in February 1988, she began to borrow money from Hattie. At the time of Hattie's death, defendant owed Hattie approximately $2,500. Defendant stated that she and Hattie had an arrangement regarding Hattie's loans to her, as Hattie knew defendant and her children had been in a car accident and that defendant would be receiving a settlement for this accident. It was understood that when defendant received this money, she would repay Hattie.

Defendant testified at trial about the home invasion incident at Hattie's on June 28, 1990. Her testimony about this was essentially the same as Agent Koehler's. Defendant stated that on that date, she did not have a telephone. Defendant denied that she knew the man who committed the robbery. She also denied that she told Hattie how much money the intruder had taken from her. Defendant saw Hattie about 12 or 12:30 p.m. that same day and Hattie told her that the police wanted Hattie to press charges against defendant for the home invasion, but Hattie refused. Hattie also loaned her $42 at that time.

Defendant stated that she began using cocaine at the end of 1988 or early 1989, but that she did not use it every day. Defendant did not believe she was addicted to cocaine.

Defendant's testimony about the events of September 6, 1990, corroborated Agent Koehler's testimony. Defendant further testified that after her family went to sleep that night, she got up at about 11:45 p.m. and left the house. When she left, she went to 35th Street near B & B Liquors, where she ran into a girl named "Poochie." She and Poochie smoked a "rock" they had bought. After dropping Poochie off by B & B's, defendant then went to Tina's house. Kensie and Tina's brother were also there in addition to Tina. Defendant drank beer, smoked "dope," and played cards with these people for the rest of the night. Defendant admitted that she and Tina left Tina's house on two occasions during the night, once at about 12:45 a.m. and the second time at about 2 a.m., to go to the area by B & B Liquors to purchase some cocaine. On both occasions, they were gone for about 15 minutes only. After the second trip to B & B's, a man by the name of Jeffrey, who lived across the street from Tina, came up to them. Defendant knew Jeff as she had been to Jeff's house to buy cocaine on other occasions and she had "smoked" there. She knew that Jeff's house was also a "crack house." This night, Jeff was talking "crazy" and used "cuss words" and was "talking all silly and stupid and stuff." Eventually, Kensie came out of Tina's house and told Jeff to get off of Tina's property.

Defendant left Tina's house at about 6 or 6:30 a.m. on September 7, 1990. Tina told her it was about time for Stanley to leave for work and for defendant to get her children ready for school. When defendant left Tina's house, Jeff again approached her and asked her to hold a package for him, a brown paper bag. Jeff put the bag in the trunk of Stanley's car. Defendant did not look inside the bag, and Jeff did not tell her what was in there. Defendant said she had no idea that the bag came from Hattie's house. Defendant attempted to find Jeff to give him the bag, but Jeff never returned, and defendant drove away.

Defendant testified that she next went to her sister Teresa's house. There, she went into the bathroom and smoked a "joint" she had. Within 10 or 15 minutes, Louise arrived at Teresa's with defendant's children. Teresa told Louise that defendant was in the bathroom, and Louise came to the bathroom door and asked defendant to come out. Louise accused defendant of taking money that Stanley owed Louise, and defendant said she had and paid Louise the $80 owed.

Louise had Stanley's keys to the car, and Louise went outside and started up the car. Defendant followed and stood behind the car so that Louise could not leave. Louise and defendant argued about the car, and defendant got the car keys away from Louise. Louise told someone to call the police. Defendant denied that she pulled a gun or a knife from the car but stated she did reach down to the floor of the car to get her set of keys which she had dropped. Defendant stuck the keys in the front of her pants as she had no pockets. Defendant admitted she opened up the trunk, took out the bag Jeff had given her, and went to the area behind Teresa's house. She stated she dropped the bag and, when she did, papers fell out, so she picked the papers up and put them back in the bag. Defendant left the bag and walked back to Teresa's.

Defendant also testified that her sister Valerie, her aunt, and her cousin came by Teresa's house, as Teresa had called and told them that defendant and Louise were fighting. Defendant left Teresa's after they arrived to take the kids to school. She then went home and changed her shirt, but she left again as she was afraid Louise might have called the Department of Children and Family Services (DCFS) as she had threatened to do, and defendant did not want to be at home if DCFS came by. Defendant went to Centreville to Niecey's apartment. She got the key to her brother's apartment from him and then went to his apartment and took a bath and changed clothes. After that she went to another apartment in the same building where Diane Howard lived, and she stayed there and smoked dope. While at

Diane's, Valerie came by. Defendant initially did not want to see Valerie, but she talked to her, and Valerie gave her Koehler's card and said DCI wanted to talk to her about an "old white lady" who lived behind defendant and who had been stabbed. Shortly thereafter, Koehler and Brueggemann showed up at Diane's apartment.

Koehler and Brueggemann asked her if she would be willing to come and talk to them about Hattie's death, and she agreed. Koehler and Brueggemann did not tell her she was a suspect in the crime, and they did not tell her she was under arrest. Defendant said the police wanted her to come with them, "being a concerned citizen of Hattie Haney." Defendant gave her car keys to Valerie and asked her to take the car to Stanley, but the police asked her to bring the car to police headquarters.

According to defendant, Koehler did not advise her of her rights while in the car. At the police station, defendant stated she got out of the police car and walked over to the car her sister was in and asked her sister what the police wanted. Defendant admitted that she agreed to retrieve the clothes she had worn the night before, but, in her testimony, when they arrived at her home, Koehler had her keys and opened the door.

Defendant corroborated that when they arrived back at police headquarters, she asked to speak to her attorney, Kevin Hoerner, and that the police allowed her to do so. At the hearing on her motion to suppress, defendant stated that Hoerner first talked to Koehler before she talked to him; however, she did not so testify at trial. Defendant testified that Hoerner told her, at that time, that he could not represent her as he worked for the State's Attorney's office. Defendant admitted that Hoerner told her she was free to get up and walk out of the interview and that she did not have to say anything. Koehler also talked to Hoerner, and defendant heard Koehler say that they wanted to ask her some questions. Defendant did not hear Koehler ask Hoerner if it was all right for him to read her her rights. Defendant talked to Hoerner again after he had spoken to Koehler. Defendant stated that Hoerner said the police were not holding her against her will and that she could leave. When defendant got off the phone, she told Koehler that Hoerner said she could leave; however, Koehler said if she tried to leave she would be placed under arrest.

Defendant admitted that she signed the rights-waiver form and that she signed her written statement. She also admitted that she made a statement to Koehler, and that he read the statement to her, but that she did not look at the statement. Defendant stated that her written statement was initially written by Koehler on "plain paper,"

but then he and Brueggemann left her alone for 20 or 25 minutes, and when they returned, her statement had been rewritten onto lined paper with her rights on it.

Defendant explained that she did not tell the police initially that she was out all night on the night of the murder as she felt she did not have to tell them, especially since her activities were illegal. She also did not tell the police about removing the bag from the trunk of her car that morning as, again, this would lead back to her illegal activities during the night. Defendant admitted that the police told her there were discrepancies between her statement and the statements of others.

Defendant denied that she made an oral statement to Koehler and Brueggemann. She testified that she did make a statement that she had gone over to a friend's house on 44th Street and waited for the friend to come home, but the friend never showed up, and therefore, she went to another friend's house on 40th Street. Defendant denied she told the police that she saw Lowdown on September 6 and 7, but said she saw Lowdown on September 5. According to defendant, Koehler and Brueggemann talked between themselves and concluded that since they had picked her up in Centreville, the knife had to be there. She denied she told the police she put the knife in the trash container, that she had a knife, or that she threw the knife in the weeds behind Teresa's house.

When questioned about the knife introduced into evidence by the State as the possible murder weapon, defendant denied that she had ever seen the knife. She stated that Stanley's fishing knife is only two to three inches long with a brown handle and that he usually kept it in a case in the trunk of his car.

Defendant admitted that she knew Marsha Gipson, a State witness, who was in jail with her in October 1990. Defendant stated that she kept her legal papers in a box under her bed while she was in jail and that she had police reports among them. According to defendant, Gipson was alone some of the time and had access to her papers. She denied she ever discussed her case with Gipson, as her attorneys had told her not to discuss her case while in jail.

On cross-examination, defendant admitted she gave the police a statement on July 3, 1990, regarding the first home invasion of Hattie's residence. At trial, defendant testified that she was out all night on June 27 and 28, 1990, and that she stopped at Hattie's to call her sister Valerie to see if she would watch her children after Stanley went to work. However, in her statement of July 3, defendant did not

admit to being out all night, but she told the police she had driven Stanley to work and then drove to Hattie's house before going home.

At trial, the following testimony pertinent to defendant's confession, in addition to Koehler's and Brueggemann's testimony, was presented: Kevin Hoerner testified that he is a lawyer, but that he handles very little criminal work. Hoerner knew defendant as she is a personal injury client of his, and he is handling a car accident case for her. On September 7, 1990, at about 2 or 2:30 p.m., he received a call from defendant. Defendant told him she was at DCI Headquarters and that the police wanted to question her regarding a murder that had occurred the night before in her neighborhood. Hoerner stated that he told defendant he wished he could help her but that he had a conflict. Hoerner asked defendant if she was being held against her will or if she was there voluntarily. Defendant did not know, so Hoerner asked to speak to one of the officers.

When one of the detectives got on the phone, Hoerner asked him what defendant was there for, and the detective told him basically the same thing; "she had been brought in for questioning." Hoerner stated that he told the officer that he did not represent defendant and that he could not do so since his firm sometimes represented the county. Hoerner could not remember if the officer asked him if it was okay to read defendant her rights. Hoerner then talked to defendant again. He told defendant she was free to leave, and he admitted he may have told defendant she did not have to say anything.

The remaining evidence presented at trial can be summarized as follows: Hattie Haney was found stabbed to death in her home at about 8:30 a.m. the morning of September 7, 1990. Her body was discovered by a Washington Park police officer, who went to Hattie's home pursuant to a call from a neighbor of Hattie's. The neighbor had noticed that Hattie's front gate was unlocked and that her front door was open, an unusual occurrence. The neighbor also called Hattie's home and received no answer. The neighbor knew that defendant was one of the few persons in the neighborhood whom Hattie allowed in her home.

The investigation of Hattie's murder revealed that jewelry belonging to Hattie and documents with Hattie's name on them were found behind Teresa Willoughby's home that same day. A knife, identified as belonging to defendant's common-law husband, Stanley, and with human blood on it, was found behind Teresa's home the following day. Defendant's fingerprints were on two of the documents recovered in the investigation.

The pathologist who performed the autopsy on Hattie testified that Hattie bled to death as a result of stab wounds to the chest, back, and neck. He also stated that the knife produced at trial could produce wounds consistent with the wounds inflicted on Hattie, *i.e.*, a sharp edge on one side and a squared-off edge on the other side.

A cellmate of defendant's at St. Clair County jail, Marsha Gipson, testified that defendant had told her "they" had murdered Hattie, since Hattie would recognize defendant. The reason Hattie was murdered was because defendant needed money to buy more cocaine. Gipson denied she was receiving anything in exchange for her testimony.

Defendant presented the testimony of numerous witnesses at trial, much of which was insignificant. However, Kensie Allen, Tina Munoz Allen, and Jonathan Pickett provided alibi testimony for defendant for the night of the murder. All three witnesses testified that defendant came by Tina's home about 12:30 or 1 a.m. on September 7, 1990. When she first arrived, defendant and Tina left the house for about 15 minutes to go buy some cocaine. Defendant and Tina left the house for a second time around 2 a.m., to again buy more cocaine. The rest of the time, the four of them played cards, and Kensie, Jonathan, and defendant drank beer and smoked crack cocaine and marijuana.

All three testified that when Tina and defendant returned after their second trip to buy drugs, they were approached by Jeffrey Williams, who lived across the street. Kensie came out of the house at that time and told Williams to leave. Defendant left Tina's house at about 6:15 or 6:30 a.m., and when she did, Williams again approached her. Kensie and Tina testified that Williams had a brown paper bag in his hand and that Williams gave the bag to defendant.

None of the three alibi witnesses ever told the police about defendant being with them the night of the murder, although Tina testified she went to the police station to do so and was told that she should go talk to defendant's attorney. It was also brought out by the State that all three witnesses had a previous criminal conviction.

Defendant also called two forensic scientists to testify. Cheryl Cherry, a trace chemist for the Illinois State Police, testified that she examined the knife found behind Teresa's house for paint. She compared the paint found on the knife to the paint on the metal box also found behind Teresa's. She found that the paint on these two items was similar in color, but that there were dissimilarities in their chemical reaction. She stated in her report: "[D]ue to previous analysis by other laboratory employees, I could not come to a definite conclusion

as to the similarity or dissimilarity of the paint." She explained that prior testing had possibly contaminated the knife and the box.

Gerald Warner, a fingerprint specialist, testified that he had been provided the fingerprint standard of Larry Sanders (Lowdown), but that these prints did not match any latent prints at Hattie's home.

After considering the foregoing evidence, the jury found defendant guilty of first-degree murder. Having set forth this extensive statement of facts, we now address defendant's contentions on appeal.

Her first argument is that the court erred in denying her motion to suppress her statements as her confession was obtained following an illegal arrest or illegal detention and, therefore, her confession was tainted. She argues that while she initially went with the officers voluntarily, her detention soon became illegal as she was not free to leave after the officers picked her up and they had no probable cause to arrest her at that time. She contends that her position is supported by the following finding in the circuit court's order denying her motion to suppress:

> "The questioning resulting in the statement made by defendant was in a custodial setting requiring the police to give defendant proper warning of her constitutional rights under *Miranda*. The police did in fact comply with the requirements of *Miranda* before questioning defendant."

Defendant argues that the court's statement that she was in a "custodial setting" reveals that the court found her to be under arrest at the time of her interrogation. Thus, she contends that her confessions should be suppressed as her statements were tainted by the illegal arrest. We disagree.

As the supreme court held in *People v. Lucas*, "In determining whether statements were made in a custodial setting, a court must consider all of the circumstances surrounding the questioning including the location, time, length, mood and mode of the interrogation, the number of police officers present, the presence or absence of family and friends of the accused, any indicia of formal arrest, any evidence of restraint, and the age, intelligence and mental makeup of the accused." (*People v. Lucas* (1989), 132 Ill. 2d 399, 417, 548 N.E.2d 1003, 1009.) After considering these factors, a court must look at the totality of the circumstances and make a determination as to what a reasonable man, innocent of any wrongdoing, would have thought if he were in the defendant's shoes. (*People v. Lucas* (1989), 132 Ill. 2d 399, 548 N.E.2d 1003; *People v. Foster* (1990), 195 Ill. App. 3d 926, 552 N.E.2d 1112.) The simple giving of a defendant's *Miranda* warn-

ings as a precautionary measure does not transform an investigative interrogation into a custodial interrogation. (*People v. Foster* (1990), 195 Ill. App. 3d 926, 552 N.E.2d 1112.) Additionally, the questioning of a defendant at a police station does not transform an investigative interrogation into a custodial interrogation, as to so hold would bar the police from ever requesting the presence of anyone for noncustodial questioning unless they had probable cause to arrest that person. (*People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870.) A court's determination that the defendant was interrogated in a custodial setting will not be disturbed on review unless this finding is against the manifest weight of the evidence. (*People v. Lucy* (1990), 204 Ill. App. 3d 1019, 562 N.E.2d 1158.) Where a court's judgment may be sustained on any ground warranted in the record, a reviewing court will do so irrespective of whether the reasons given or the specific findings of a court are correct. *People v. Hamilton* (1978), 56 Ill. App. 3d 196, 371 N.E.2d 1234, *aff'd* (1979), 74 Ill. 2d 457, 386 N.E.2d 53.

Here, although defendant argues that the officers had no probable cause to arrest her before her interrogation, we find that the trial court did not address this specific allegation. The lone statement by the court that defendant was interrogated in a "custodial setting" does not resolve whether the officers had probable cause to arrest. If, in fact, the phrase "custodial setting" is comparable to stating that the officers had probable cause at the time of defendant's interrogation, then this court must disagree with the trial court on this finding. Although the trial court denied defendant's motion to suppress statements, a correct judgment in this case as will be discussed *infra*, the court's specific finding of "custodial setting" was erroneous.

■ An analysis of the facts of this case as to the factors to be considered in determining whether defendant's statements were made in a custodial setting reveals that defendant was not illegally detained. The evidence was clear that she went with the officers voluntarily to answer questions about her knowledge of Hattie's death. Defendant also agreed, again voluntarily, to surrender the possession of the clothing she had worn earlier. Defendant was not interrogated about her activities until 2:50 p.m., almost an hour and a half after she was picked up for questioning, and her questioning only proceeded for about another hour and a half before defendant made her inculpatory oral statement. This is not an extraordinarily long time, especially since most of the time before questioning was spent in travel from the police headquarters to defendant's home and back again. Further, at defendant's home, Koehler testified he again asked

defendant if she would go to police headquarters for questioning, and defendant again agreed. These actions on the part of defendant, as well as Koehler's question about returning to the police station, indicate that defendant was not being detained.

Similarly, defendant's testimony about her conversation at the police headquarters with attorney Hoerner revealed that defendant was told by the attorney that she was free to leave and that she need not say anything. In addition, defendant did not ask to leave or refuse to answer questions. She was never told by the police that she could not leave, although, in fairness, the police never told her that she could leave. Further, defendant was not left alone at any time, unlike two of the cases cited by defendant in support of her position. (*People v. Townes* (1982), 91 Ill. 2d 32, 435 N.E.2d 103; *People v. Young* (1990), 206 Ill. App. 3d 789, 564 N.E.2d 1254.) Defendant was never handcuffed, fingerprinted, or subjected to any of the other indicia of an arrest. Agent Koehler also testified that he believed defendant was not free to leave after she made her inculpatory admission, but that she was free to leave before that time. Thus, we find that probable cause to arrest defendant did not arise until after her inculpatory statement, but until that time she was not illegally detained, as a reasonable, innocent person would have believed she was free to leave. Therefore, her statements were admissible, as she was not under arrest at the time of her statements and her statements were not tainted by an illegal arrest. In fact, the officers were not required to give her the *Miranda* warnings before she made her written statement, as she was not subject to custodial interrogation.

The defendant contends in her second subissue that her confession was inadmissible as the officers failed to discontinue their questioning after defendant invoked her right to have counsel present at her interrogation. We again disagree.

It is well established that a defendant's fifth amendment (U.S. Const., amend. V) right to counsel does not accrue until a defendant is subject to custodial interrogation. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) An interrogation is custodial if a person has been taken into custody or her freedom is restricted in any significant way. (*People v. Brown* (1990), 136 Ill. 2d 116, 554 N.E.2d 216.) If a defendant is not in custody or subject to custodial interrogation, *Miranda* is inapplicable. *People v. Lucas* (1989), 132 Ill. 2d 399, 548 N.E.2d 1003.

In our previous discussion of whether defendant's statements were obtained pursuant to an illegal arrest, we held that defendant was not subject to custodial interrogation until after she made her in-

culpatory oral confession. Thus, defendant's *Miranda* rights, including her right to counsel, did not arise until this point in time. Therefore, we find that defendant's fifth amendment right to counsel was not violated, and her confession was admissible, as her right to counsel had not arisen until after her inculpatory oral admission.

Further, it is significant that after defendant was subject to custodial interrogation, the police did not question her after she again asked to speak with her attorney, even though she was unable to reach him. The police recognized that, once she was subject to arrest, her request to talk to her attorney triggered her right to counsel and for them to interrogate her at that time would violate her rights.

■ The defendant's last subissue is that the admission of her confession was not harmless error and that without her confession the evidence was insufficient to prove her guilty of first-degree murder beyond a reasonable doubt. Again, defendant's contention rests upon the admissibility of her confession; therefore, we need not give undue attention to this subissue as we have held that her confession was admissible. Suffice it to say, without going through the litany of evidence produced at trial, which we have already set out at great length, defendant was proven guilty beyond a reasonable doubt. The record revealed that defendant was not at home on the night of the murder, that she threw items belonging to Hattie behind Teresa's house the morning of the murder, and that defendant's fingerprints were found on items taken from Hattie's home. In addition, although defendant had three witnesses who provided her with an alibi for the night of the murder, the jury could have found the alibi witnesses' testimony inherently incredible. All three witnesses failed to come to the police with their information, and they were each shown to have criminal backgrounds, which undermined their credibility. This evidence, combined with defendant's confession, was more than sufficient to prove defendant guilty beyond a reasonable doubt.

Defendant's next issue is that her constitutional right to equal protection of the law was violated when the State used two of four peremptory challenges to exclude the only two black persons voir-dired from the jury. Defendant moved to have the jury struck pursuant to *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, and the court held a hearing on defendant's motion before proceeding with the trial. At that hearing, the court determined that defendant had established a *prima facie* case of discrimination, but that the State's reasons for excluding the two black persons were sufficiently race-neutral and were supported by the evidence in the record. Defendant contends that the State's reasons were pretextual

and that the court's determination that the reasons were race-neutral was against the manifest weight of the evidence.

In *Batson v. Kentucky*, the Supreme Court held that the intentional exercise of peremptory challenges to discriminate against jurors based upon their race violated the equal protection clause of the fourteenth amendment. (*People v. Thomas* (1990), 201 Ill. App. 3d 255, 559 N.E.2d 262.) It is the defendant's burden to establish a *prima facie* case of discrimination, and once a *prima facie* case has been made, the burden shifts to the State to show that its reasons for exclusion were race-neutral. (*People v. Cook* (1991), 217 Ill. App. 3d 299, 576 N.E.2d 1242.) The burden on the State is not a heavy one, and the State's explanations need not rise to the level of justifying a challenge for cause. (*People v. Thomas* (1990), 201 Ill. App. 3d 255, 559 N.E.2d 262.) After the State has proffered its explanations, the court must determine whether the reasons are sufficient to rebut defendant's *prima facie* case. (*People v. Cook* (1991), 217 Ill. App. 3d 299, 576 N.E.2d 1242.) In making its determination, a court must make a sincere and reasoned attempt to evaluate the prosecutor's explanations in light of the circumstances of the case. (*People v. Cook* (1991), 217 Ill. App. 3d 299, 576 N.E.2d 1242.) Because the court's determination is a matter of fact and involves questions of credibility, a trial court's findings will not be overturned on review unless its determination is against the manifest weight of the evidence. *People v. Cook* (1991), 217 Ill. App. 3d 299, 576 N.E.2d 1242.

In this case, defendant does not raise an issue regarding the court's finding that she established a *prima facie* case of discrimination, and the State likewise does not challenge this finding. The only issue to be considered on review, therefore, is whether the State's explanations for the exercise of its peremptory challenges were sufficiently race-neutral and not violative of defendant's right to equal protection under the law.

Only two black persons out of the 28-person venire were voir-dired for selection on the jury. Both of these black persons were excused by the State through the exercise of its peremptory challenges. At the hearing held pursuant to *Batson*, the State gave as its reasons for excluding these two jurors as follows: David Lay was excused by the State because his 23-year-old younger brother had been murdered in Atlanta, Georgia. From the questioning of Lay during *voir dire*, it was determined that no person was ever charged with this crime, and Lay stated that he was "just a little peeved that there was no investigation and nobody was brought to trial." The State explained that it was uncomfortable with this juror since the evidence in this case was

circumstantial and since it is implied from the evidence in this case that someone else may have been involved with defendant but was not charged. When questioned by the court as to why the State excluded Lay but did not exclude Keith Woods, a white juror who had been the victim of an armed robbery for which no one was ever charged, the State indicated that Woods did not indicate dissatisfaction with the police investigation or have an "attitude," as Lay did.

Beverly Lyke, the other black person questioned during jury selection, was excused by the State because she had relatives that had been charged with crimes and because some of those relatives had been sent to the penitentiary. The court pointed out to the prosecutor that Lyke had said she was not close to these relatives and was hardly acquainted with them. The court also asked the prosecutor why he excluded Lyke but not Timothy Bandy, a white juror who had pleaded guilty to a misdemeanor battery charge. The prosecutor explained that if Bandy had spent time in the county jail, this was not equivalent to time in the penitentiary. The prosecutor further explained: "Mr. Bandy was very attentive in regard to the jury selection. He seemed to be very responsive to the questions as they were asked by particularly [*sic*] counsel and by the Court as well as defense counsel. I thought that Mr. Bandy would be a good attentive juror as far as listening closely to the volume of evidence that we have in this particular case." The prosecutor also thought that the fact Bandy had pleaded guilty indicated that Bandy had an appreciation of the law and had taken responsibility for his wrongdoing.

■ Following the State's explanations, the court stated as follows:

> "As to the Batson challenge, I recognize the problem that we have here and to say I was or to deny that I was troubled by the fact that the only two black jurors were stricken would be not proper [*sic*] because it did concern me yesterday, and it also concerned me that the fact that the only other black jurors were at the bottom of the list. However, I don't see as far as placing them on the bottom of the list, that that is anything other than the result of luck of the draw. Based upon the testimony of the prosecutor and his explanations, further based upon the fact that I don't find any lack of good faith in his explanation and I find that there is sufficient evidence to support the reasonableness of his race neutral explanation, I am going to deny the Batson motion * * *."

Thus, the court conscientiously questioned the prosecutor and considered his explanations in conjunction with the conduct of the *voir dire*.

A review of the *voir dire* of Lay and Lyke revealed that Lay had formerly worked for the Federal marshall transporting convicted criminals. Some of the persons he transported had been accused of possessing and distributing drugs. Also during *voir dire*, Beverly Lyke revealed that a cousin of hers was murdered in East St. Louis and that drugs were involved in the crime. This evidence provides additional support to the court's finding that the prosecutor's explanations were race-neutral and not pretextual. Additionally, the prosecutor's explanation for keeping Bandy and not Lyke indicated the prosecutor found something in Bandy that he did not find present in Lyke, an attentive juror, which was a race-neutral reason for keeping Bandy and striking Lyke. We note that defendant discusses two other white jurors with comparable backgrounds to the black jurors struck by the State, Delbert Lurtz and Janet Huelsman. We need not consider these jurors as they were both excused by defendant, one for cause and the other through the exercise of a peremptory challenge, and were not selected for the jury. We find that the court's determination that defendant's constitutional right to equal protection was not violated by the State's exercise of its peremptory challenges was not against the manifest weight of the evidence.

The last issue raised by defendant is that she was denied a fair trial when the court admitted evidence of another crime, as this evidence had no probative value and was highly prejudicial. Defendant argues that the prior home invasion of Hattie's residence, involving both Hattie and defendant, should not have been admitted as it was not established that defendant committed this crime and this evidence was extremely prejudicial.

Evidence of other crimes is admissible if the evidence is presented for any other purpose than to show a defendant's propensity to commit a crime, such as *modus operandi*, intent, identity, motive, or absence of mistake. (*People v. Evans* (1988), 125 Ill. 2d 50, 530 N.E.2d 1360.) In addition, the evidence of the other crimes need not be identical to the crime charged to be admissible. *People v. Richardson* (1988), 123 Ill. 2d 322, 528 N.E.2d 612.

■ In our previous statement of facts, the evidence of the home invasion at Hattie's residence on June 28, 1990, was adequately set out and the facts of that crime need not be reiterated here. Suffice it to say, the evidence of the prior home invasion was admissible to show defendant's motive and knowledge. The evidence of the prior home invasion, which defendant admitted participating in, revealed that defendant had knowledge of where Hattie kept her valuables. Given the fact that the only room ransacked at the time of the mur-

der was the room to which Hattie had gone at the time of the home invasion to obtain money to give the intruder, this evidence was probative of defendant's knowledge. Both home invasions involved a similar *modus operandi* in that defendant and an armed black male selected an old defenseless woman with cash in her house. Further, the motive for the home invasion and for the murder was the same, to enable defendant to obtain money to purchase drugs. Therefore, the evidence of the prior home invasion was admissible.

We also note that the prejudicial effect of this evidence was limited when the jury was instructed that the evidence of other crimes was admitted solely for the limited purpose of showing "defendant's identification or intent or a motive or a design in regards to this particular offense." The court instructed the jury that the evidence was to be considered only for this limited purpose. *People v. Evans* (1988), 125 Ill. 2d 50, 530 N.E.2d 1360.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

CHAPMAN, P.J., and MAAG, J., concur.